Robert Anderson Ryan v. State















IN THE
TENTH COURT OF APPEALS
 

No. 10-01-177-CR

     ROBERT ANDERSON RYAN,
                                                                         Appellant
     v.

     THE STATE OF TEXAS,
                                                                         Appellee
 

From the 18th District Court
Johnson County, Texas
Trial Court # F34372
                                                                                                                
                                                                                                         
O P I N I O N
                                                                                                                

      Robert Anderson Ryan was charged with five counts of injury to a child. Judy was Ryan’s
girlfriend. The victims were Judy’s two daughters: Jennifer, age 5 and Sheila, age 9. The jury
found him guilty of two counts of intentionally causing bodily injury to Jennifer and one count of
recklessly causing bodily injury to Sheila. Punishment was assessed at eight years in prison and
a $1,000 fine for each count against Jennifer. The jury assessed punishment at two years in a state
jail facility and a $500 fine for the offense against Sheila. Ryan now appeals his conviction. We
affirm.
Background
      Ryan lived with Judy and her four children. Ryan stayed with the children while Judy
worked. One evening, the youngest child, Jennifer, was vomiting and having seizures. Judy took
Jennifer and the other children over to Jennifer’s grandmother’s house. Jennifer’s grandmother
took them all to the hospital. Jennifer was admitted to the hospital with multiple bruises to her
brain and bruising all over her body. The most severe external bruising appeared on her buttocks. 
Investigators questioned Ryan about Jennifer’s injuries. He admitted to spanking Jennifer with
a flip-flop and to throwing her onto the bed where she bumped her head. Later, the other children
were taken to the Advocacy Center and interviewed. During the interviews, similar external
bruising was found on Sheila, Jennifer’s 9 year old sister.
Voluntariness of Confession
      In his first issue, Ryan contends that the trial court erred in admitting his written confession
and videotaped statement because he was mentally coerced by investigators with the Johnson
County Sheriff’s Office.
      An accused must give his confession voluntarily before it can be used against him. Penry v.
State, 903 S.W.2d 715, 744 (Tex. Crim. App. 1995); Sendejo v. State, 953 S.W.2d 443, 447-48
(Tex. App.—Waco 1997, pet. ref’d). Once the accused contests the admission of his statement
on the ground of “involuntariness,” the due process guarantee requires the trial court to hold a
hearing on the admissibility of the statement outside the presence of the jury. Alvarado v. State,
912 S.W.2d 199, 211 (Tex. Crim. App. 1995) (citing Jackson v. Denno, 378 U.S. 368, 380, 84
S.Ct. 1774, 12 L.Ed.2d 908 (1964)). See also Tex. Crim. Proc. Ann. art. 38.22 § 6 (Vernon
1979). At the hearing, the trial court is the sole judge of the weight and credibility of the
evidence, and the court’s findings may not be disturbed on appeal absent a clear abuse of
discretion. Alvarado, 912 S.W.2d at 211.
      Ryan contends on appeal that his confession was involuntary because he was mentally coerced
into signing it. Involuntary confessions offend due process when they flow from the improper
conduct of law enforcement officials. Lane v. State, 933 S.W.2d 504, 511 (Tex. Crim. App.
1996). Mental compulsion is a subtle force associated with offering a defendant two choices, one
of which results in a penalty, punishment, or detriment from which the defendant is entitled to be
free. Thomas v. State, 723 S.W.2d 696, 704 (Tex. Crim. App. 1986) (consent to breath test); see
also Flemming v. State, 949 S.W.2d 876 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (citing
Thomas, supra). The voluntariness of a confession is determined by a review of the totality of the
circumstances. Creager v. State, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997).
      Prior to trial, the trial court held a hearing to determine the voluntariness of Ryan’s written
and videotaped statements. At the hearing, Ryan admitted that he accompanied a police officer
to the Johnson County Law Enforcement Center for questioning about the injuries to Jennifer. He
knew he was not under arrest. He was read his Miranda warnings prior to any questioning. Ryan
testified that he understood those rights and decided to talk to the investigators anyway. He stated
that he knew he could be arrested for what he told them. His complaint, however, was that he felt
he was threatened to admit to throwing Jennifer on the bed where she then hit her head on the bed
post or Judy would be arrested and all her children taken away from her. By the end of his
testimony, Ryan admitted that the investigators did not tell him that they would arrest Judy if he
did not sign a statement.
      Detective Michael Gaudet testified at the hearing that he conducted an interview of Ryan
which was videotaped. He denied ever threatening Ryan with Judy’s arrest. He also denied
implying that Judy would be arrested unless Ryan admitted to causing Jennifer’s head injury. 
Detective Allan Gilreath also interviewed Ryan. He watched Gaudet conduct his interview from
an observation room. Gilreath stated that he did not hear Gaudet threaten Ryan with Judy’s arrest
if he did not give a full confession. When Gaudet completed his interview, Gilreath testified that
he then conducted an interview of Ryan. He stated that at no time did he threaten Ryan with
Judy’s arrest unless Ryan confessed. Gilreath also watched from a different room when
Lieutenant Troy Fuller interviewed Ryan. He did not observe Fuller threaten Ryan with Judy’s
arrest if Ryan did not confess.
      After Ryan gave a statement, Fuller spoke with him. Fuller testified to the same statements
made by Detectives Gaudet and Gilreath: that no one threatened Ryan with the arrest of Judy if
Ryan did not confess.
      The videotape of Ryan’s interview was admitted into evidence. It corroborates the
investigators’ testimony. The trial court reviewed the video after the hearing. In findings of fact
and conclusions of law, the trial court stated, among other things, that Ryan was not coerced or
threatened to make his statement; that he was made no promise of help or leniency to either
himself or Judy to induce Ryan to make his statement; and that he was never threatened with the
possibility of Judy being arrested to induce Ryan to make a statement. The trial court concluded
that the written and recorded statements were freely and voluntarily given and signed by Ryan and
were admissible in evidence.
      Under the totality of the circumstances, the trial court did not abuse its discretion in finding
Ryan’s confession to be voluntary and in admitting Ryan’s written confession and videotaped
statement. His first issue is overruled.
Photographs
      In his second issue, Ryan contends that the trial court erred in admitting 20 photographs of
the injuries his two victims received because they created an unfair prejudice which outweighed
any probative value they may have had. The Texas Rules of Evidence provide that although
relevant, evidence may be excluded if its probative value is substantially outweighed by the danger
of unfair prejudice. Tex. R. Evid. 403.
      The admissibility of a photograph is within the discretion of the trial court and is reviewed
for an abuse of discretion. Chamberlain v. State, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999);
Kelley v. State, 22 S.W.3d 642, 644 (Tex. App.—Waco 2000, no pet.). We will not find error
in a trial court’s evidentiary ruling unless it falls outside “the zone of reasonable disagreement.” 
Narvaiz v. State, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992); Montgomery v. State, 810
S.W.2d 372, 391 (Tex. Crim. App. 1990).
      In response to a Rule 403 objection to a photograph, the trial court must decide whether the
probative value of the photograph is substantially outweighed by the danger of unfair prejudice. 
Salazar v. State, 38 S.W.3d 141, 151 (Tex. Crim. App. 2001); Najar v. State, 74 S.W.3d 82, 89
(Tex. App.—Waco 2002, no pet.); Tex. R. App. P. 403. When making this determination, the
trial court should consider “the number of photographs, the size of the photograph, whether it is
in color or black and white, the detail shown in the photograph, whether the photograph is
gruesome, whether the body is naked or clothed, and whether the body has been altered since the
crime in some way that might enhance the gruesomeness of the photograph to the [defendant’s]
detriment.” Reese v. State, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000); Najar, 74 S.W.3d at
89.
      Ryan was charged with injuring two children. Eleven of the photographs were of Jennifer. 
Nine were of Sheila. The photos were normal-sized, 4 inch by 6 inch. As presented to this court,
they were black and white xeroxed copies. No one testified as to whether the photos were
originally color or black and white. Jennifer was the most severely beaten of the two girls. The
photos of her show the various bruises all over her body: the front of her shoulder, the back of
her shoulder, the side of her face, the backs of her legs, and the severe bruising on her buttocks. 
However, they are not gruesome. The photos depict Jennifer as unclothed but only to the extent
necessary to show the bruises. As for Sheila, the photographs also depict the bruising apparent
on the various parts of her body. She, too, is unclothed in the photos but again, only to the extent
necessary to show her injuries. Nor are these photos gruesome.
      The probative value of these photographs, that is depiction of the children’s injuries, was not
substantially outweighed by the danger of unfair prejudice. Thus, the trial court did not abuse its
discretion in admitting these photographs. Ryan’s second issue is overruled.
Conclusion
      Having overruled Ryan’s two issues on appeal, the trial court’s judgment is affirmed.


                                                                   TOM GRAY
                                                                   Justice

Before Chief Justice Davis,
      Justice Vance, and
      Justice Gray
Affirmed
Opinion delivered and filed October 30, 2002
Do not publish
[CR25]



l barn
down below Joe's barn, and when he came by he'll just blow [Joe's] brains out." Further, she
testified that Ludwig said, "[A]nd I may just have to take Matt out, too." When asked by the
prosecutor whether Ludwig was specific about how he would "take [Joe] out," Theresa replied,
"He said he would have a shotgun."
      On April 18, 1990, after Theresa had moved to Ennis, she recorded a telephone conversation
with Ludwig in which he denied watching the Trojacek family or putting a "steel post up against
[Kitty's] van door so that she would know that somebody was there."
      Ludwig asserts in points one and two that these communications are confidential under Rule
504(1)(a) because they were made in private to his spouse and not intended for disclosure. See
id. 504(1)(a). Thus, he argues that Rule 504(1)(b) and (c) allow him to prevent their disclosure. 
See id. 504(1)(b), (c). The State relies on (1) the exception created in Rule 504(d)(2) that allows
testimony about spousal conversations if the "accused is charged with a crime against the person
of any minor child or any member of the household of either spouse," (2) the exception created
in Rule 504(d)(1) that allows testimony about spousal conversations if "made, in whole or in part,
to enable or aid anyone to commit or plan to commit a crime or fraud," and (3) assertions that the
conversations were never intended to be confidential. See id. 504(1)(a), (d)(1), (d)(2). With
respect to the April 18 recorded statement, the State further asserts that it was voluntarily disclosed
to a third party and was not made during the marriage relationship. We will, for this discussion,
assume that all statements were made during their marriage, that Ludwig did not intend for
Theresa to disclose the communications, and that the April 18 statement was not disclosed to any
third party.
      The dispute about the State's first contention centers around whether the phrase "of either
spouse" in Rule 504(d)(2) modifies the phrase "of any minor child." If so, Ludwig's statements
would be privileged in this proceeding because Matthew was not his and Theresa's child. Neither
party has directed our attention to a case on point, and our research reveals none.
      In support of its position, the State points out that the predecessor of Rule 504 is the now-repealed article 38.11 of the Code of Criminal Procedure, which read in pertinent part:
Neither husband nor wife shall, in any case, testify as to communications made by one
to the other while married . . . . However, a wife or husband may voluntarily testify against
each other in any case for an offense involving any grade of assault or violence committed by
one against the other or against any child of either under 16 years of age . . . .

Act of May 23, 1973, 63rd Leg., R.S., ch. 399, § 2, 1973 Tex. Gen. Laws 968, 972-3, repealed
by Act of May 27, 1985, 69th Leg., R.S., ch. 685, § 9, 1985 Tex. Gen. Laws 2472, 2474
(emphasis added). Thus, it argues that the elimination of the words "of either" and the rewording
of Rule 504 changed the way the confidential communication privilege works. 
      We turn to the commentators on our rules of evidence. In one, we find:
It is not clear whether the drafters intended to limit this exception to any minor child of
either spouse. That limitation did appear in Article 38.11, but, under the new rule, it is
possible to argue that the phrase "of either spouse" pertains only to "members of the
household" and not to "the person of any minor child." Although it would not be
unreasonable to read this exception broadly enough to cover crimes against any minor child,
it is just as reasonable to conclude that both the "minor" exception and the "member of the
household" exception are limited by the language "of either spouse." Under either reading,
this exception clearly recognizes greater public awareness and concern for crimes against
children and crimes within the household. A balancing test would suggest that the need for
disclosure is greater than protecting otherwise confidential marital communications.

Hulen D. Wendorf, David A. Schlueter & Robert R. Barton, Texas Rules of Evidence
Manual, 3rd Ed. Rule 504 (1991). In another, we find: "[A]nother important change effected
by the exception is that the minor child need not be a child of either spouse or even a member of
either spouse's household." 1 Steven Goode, Olin G. Wellborn III & M. Michael Sharlot,
Guide to the Texas Rules of Evidence: Civil and Criminal, 2nd Ed. § 504.8 (Texas
Practice 1993). In support of their position, the authors state that the words "of either spouse"
were included in the rule as recommended by the Subcommittee on Criminal Matters of the Senate-House Select Committee on the Judiciary to the Select Committee on Rules of Evidence in
Criminal Cases in 1985 and were thereafter 
eleted. Id. § 504.8 n.11. The commentators continue:
The provision reflects a perception of two, perhaps related, social phenomena. First, it
expresses concern over the perceived increase in assaults, both sexual and violent, against
children and the aged. Second, it reflects the increased frequency with which children who
are unrelated to either spouse may be placed in the home for short periods, as with day or
foster care, and the increase in the number of elderly persons and their presence as part of
others' households. The new provision's obvious intent is to require spousal testimony in any
prosecution for a crime against the person of a minor child, whether or not a member of either
spouse's household, or against the person of a household member of either spouse.

Id. § 504.8 (emphasis added).
      Ludwig cites Nelson v. State, 612 S.W.2d 605 (Tex. Crim. App. 1981), and Garcia v. State,
573 S.W.2d 12 (Tex. Crim. App. 1978), in support of his position. Both, however, were decided
before the adoption of the Rules of Criminal Evidence and involved interpretations of Article
38.11. Neither is particularly helpful in our analysis. 
      Ludwig's pro-se brief states that Johnson v. State, 803 S.W.2d 272 (Tex. Crim. App. 1990),
cert. denied, ———U.S. ———, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991), "upholds every aspect
and nuance of this privilege."


 However, Johnson holds that the state may not ordinarily call a
spouse to testify when it knows that the spouse will invoke the marital privilege and that the state
should not be permitted to cross-examine a spouse on irrelevant matters at a suppression hearing. 
Id. at 281-83.
      That all three branches of government are increasingly concerned about sexual and violent
assaults against children is beyond question. We understand the exception contained in Rule
504(1)(d)(2) to expand the number of cases involving crimes against children in which an accused
will not be permitted to invoke a marital privilege and prevent the jury from hearing otherwise
relevant testimony. See Tex. R. Crim. Evid. 504(1)(d)(2). Thus, assuming for Ludwig's benefit
that these statements to Theresa were made during their marriage, were intended to be
confidential, and were not disclosed to any third party, we hold that the State was entitled to the
benefit of the exception stated in Rule 504(1)(d)(2) because Ludwig was being tried for an offense
against Matthew Trojacek, a minor child. See id. Because the court properly admitted Theresa's
testimony about the statements, we overrule points one and two. 
      Having overruled the points, we do not reach the State's contention that the exception for
statements in furtherance of crime or fraud also applies. See id. 504(1)(d)(1). The judgment is
affirmed. The remainder of the opinion is ordered not published. See Tex. R. App. P. 90.
SUFFICIENCY OF THE EVIDENCE
      The sixth point in Ludwig's counsels' brief is that the evidence is insufficient to sustain the
conviction for capital murder. Trial in this case began on July 8, 1991, before the date of the
opinion in Geesa v. State, 820 S.W.2d 154, 156-57 (Tex. Crim. App. 1991).
standard of review
      The standard of review for challenges to sufficiency of the evidence is whether, after viewing
the evidence in the light most favorable to the judgment, any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); Butler v. State, 769 S.W.2d 234, 239
(Tex. Crim. App. 1989); Carlsen v. State, 654 S.W.2d 444, 448 (Tex. Crim. App. 1983) (on
rehearing). "This standard is the same for both direct and circumstantial evidence cases." Green
v. State, 840 S.W.2d 394, 401 (Tex. Crim. App. 1992), cert. denied, ——— U.S. ———, 113
S.Ct 1819, 123 L.E.2d 449 (1993). If, in applying the standard in a circumstantial evidence case,
the reviewing court finds that there is a reasonable hypothesis other than the guilt of the accused,
then it cannot be said that guilt has been shown beyond a reasonable doubt. Turner v. State, 805
S.W.2d 423, 427 (Tex. Crim. App.), cert. denied, ——— U.S. ———, 112 S.Ct. 202, 116
L.Ed.2d 162 (1991); Johnson v. State, 673 S.W.2d 190, 195 (Tex. Crim. App. 1984).
      Under the Jackson standard, we do not position ourselves as a thirteenth juror in assessing
the evidence; rather, we position ourselves as a final, due-process safeguard ensuring only the
rationality of the factfinder. See Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). 
We have only the discretion to determine if any rational trier of fact, considering the evidence
admitted at trial, could have found the essential elements of the offense beyond a reasonable doubt. 
See Rodriguez v. State, 819 S.W.2d 871, 873 (Tex. Crim. App. 1991). We do not make our own
myopic determination of guilt from reading the cold record. See Moreno, 755 S.W.2d at 867. 
We do not disregard, realign, or weigh evidence. See id. The trier of fact is the sole judge of the
weight and credibility of the witnesses and may believe or disbelieve all or any part of any
witness' testimony. Williams v. State, 692 S.W.2d 671, 676 (Tex. Crim. App. 1984). We do not
resolve any conflict in fact or evaluate the credibility of the witnesses. See Juarez v. State, 796
S.W.2d 523, 524 (Tex. App.—San Antonio 1990, pet. ref'd). The law is well-settled that
contradictory testimony does not render the evidence insufficient. Mercado v. State, 695 S.W.2d
25, 29 (Tex. App.—Corpus Christi 1985), aff'd, 718 S.W.2d 291 (Tex. Crim. App. 1986). Later
contradictory evidence does not destroy the probative value of earlier testimony. Id.
      Sufficiency of the evidence must be determined from the charge given, which means the entire
charge. See Jones v. State, 815 S.W.2d 667, 668 (Tex. Crim. App. 1991); Nickerson v. State,
782 S.W.2d 887, 891 (Tex. Crim. App. 1990). If the State does not object to a jury charge that
enhances its burden, sufficiency of the evidence will be measured against that charge. Fee v.
State, 841 S.W.2d 392, 396 (Tex. Crim. App. 1992).
      In applying the "reasonable alternative hypothesis" analysis, "[t]he correct procedure involves
accepting the inculpatory circumstances . . . and then asking if there is a reasonable hypothesis
other than guilt which also would account for such circumstances." Gunter v. State, 858 S.W.2d
430, 439 (Tex. Crim. App. 1993) (citing Girard v. State, 631 S.W.2d 162, 164 (Tex. Crim. App.
[Panel Op.] 1982)); see also Green, 840 S.W.2d at 401. For a reasonable hypothesis to be
outstanding, there must be no competent evidence to the contrary. Nilsson v. State, 477 S.W.2d
592, 597 (Tex. Crim. App. 1972). For an outstanding hypothesis to be reasonable, it must be
supported by some credible evidence. Criner v. State, 860 S.W.2d 84, 86 (Tex. Crim. App.
1992); Nilsson, 477 S.W.2d at 597. The reviewing court must explain how the record raises the
issue of the existence of an outstanding reasonable hypothesis to support an inference other than
the guilt of the accused. Criner, 860 S.W.2d at 86.
the evidence
      Viewing all the evidence in the light most favorable to the prosecution, the record contains
inculpatory circumstantial evidence. 
      family members
      Theresa Trojacek, Ludwig's wife, testified that she graduated from veterinary school in 1979. 
She met Ludwig in 1981, married him in 1984, had one son in 1985, and was in the process of
getting a divorce in 1990. They worked together at a veterinary clinic that they owned in League
City and later sold for over five hundred thousand dollars. She testified that, although she wanted
to resume a practice and Ludwig did not, they decided, after studying the economic feasibility,
to open another clinic in Katy. She said that her father, who retired from Ennis Automotive and
died in 1988 at age 64, owned about 160 acres in Ellis County, the "farm," on which her mother
still lived. She said that in 1987 Ludwig started bringing up the farm more and more, complaining
that "I needed to start showing some interest in the farm," that "Joe was getting more of the farm
than [my sister] and I," and that "Joe was the prodigal child." She said that she was not concerned
because her "mother and dad had always been fair when they gifted us things." After property
was exchanged within the family, which Ludwig thought "was not a fair deal," he "demanded"
that she ask her father for an additional $5,000. 
      Theresa said that in March of 1988, after they had moved to Katy, he brought the subject up
again and "got very angry." When asked how he expressed that anger, she said:
We were in the master bedroom and he again brought up Joe being the prodigal child,
and he was sure that Joe was going to end up with all the property while I sat back and did
nothing to help get my property, get my proper inheritance. He got very angry . . . and he
threw a VCR tape at the door where I was standing. It hit the door. I was standing very
close to the door. He started ripping sheets off my son's bed.

On another occasion, Ludwig got angry and threw a television set and a living room chair because
a woman from whom he had bought property and whom he was supposed to help "demanded so
much of his time and work." He also got angry at Theresa over her accepting night calls and over
computer records. She said that he would leave after these "major blowups" and return "hours
later and everything was fine." They did not discuss the "blowups" later because he would
apologize and she did not want to anger him again. She said that "at one time he's been working
with a psychologist on his temper." 
      In 1988 after her father died, she and Ludwig attended a meeting at Joe's office. "Joe had
wondered at that time what I thought of -- since [my sister] and I were not living on the farm, he
had wondered if what I thought of him getting the farm when the time came for things to be gifted
or divided up." She said that she told Joe that she was not sure about her plans, that she might
want some of the land on the road. She characterized the meeting as "friendly." Later, Ludwig
would ask, "Didn't I tell you Joe was going to get the farm . . . and let you and [your sister] be
happy with just a little bit of cash? Didn't I tell you that?" He began bringing it up about every
two weeks. 
      Theresa said that in 1989 she received a legal document concerning her father's estate that
required her signature. When she showed it to Ludwig, he became "real antsy about the
situation," which involved a gift from her grandmother, Annie Trojacek, to her mother. She said:
 That initiated him to start demanding I get an appraiser to go check the value of properties in
Ennis, and I, again, just -- we were working on building the clinic, and I had a lot of other
responsibility in Katy, and worrying about acreage in Ennis just wasn't a concern of mine. 
And he kept insisting that I get an appraiser and have it appraised, so I could show everybody
the value of the property and show them, particularly mother, at that time, how [my sister]
and I were getting screwed and Joe was getting this 60 acres.

She said that saving taxes was a big issue with Ludwig and that he would make suggestions to her
mother about making gifts of property "so that she would become -- be worth nothing or indigent
so the State, when she got to the age that she needed to be in a nursing home the State would take
care of her and there wouldn't be all those inheritance taxes that she would have to worry about." 
She said that she became very uncomfortable with that type of conversation that "would go on and
on for hours." Primarily as a result of a confrontation between Ludwig and her mother and
Ludwig's "increased obsession" with her family's property, Theresa separated from him in April
of 1989 and filed for divorce on May 10.
      After their separation, Ludwig was told about the gifts that her grandmother had made and,
without Theresa's knowledge, hired an attorney to seek a guardianship for her grandmother. The
family found out about it when he appeared on her mother's property, with an appraiser, and
handed Joe the application for guardianship.
      During the separation, she first met Ludwig's mother and brother when they came to the clinic
for a scheduled child-visitation period. She had not met them from 1981 to 1989, so Ludwig and
his family were estranged for at least eight years. She said that his family had "had a falling out
. . . over an acreage that [Ludwig] -- a camp house on five acres of land in Sealy or outside of
Sealy" and that they had repaired their relationship while she and Ludwig were separated. 
      Later that summer, after counselling, Ludwig and Theresa started spending more time
together. Under an agreement they worked out, Theresa started working at the newly-opened
clinic in Katy as a salaried employee. She said that they were attempting a reconciliation and that,
as far as she knew, Ludwig was doing nothing about the property in Ennis. The guardianship had
been dropped. After he apologized for having interfered with her family's business and for filing
the guardianship, Theresa "assumed that he was through with things in Ennis."
      In November, they bought a house in Katy and moved in together. Theresa said, "It was
almost as soon as we moved into that . . . house, Ennis was coming up again." She said that,
instead of calling Joe "the prodigal child," he said "that son-of-a-bitch and he's stealing land from
you and . . . you're not getting your son's inheritance." On December 8, Ludwig "fired me from
the clinic and demanded that I give him the keys to the clinic back. He said that if he couldn't
trust me to handle my affairs in Ennis that are worth hundreds of thousands of dollars, how could
he trust me with his clinic. . . . I was very upset. I gave him the keys back." Later that day, she
had a miscarriage. Early the next day, after she went home from the hospital, he began discussing
the Ennis property "over and over and over again, and what I was taking from our son, what I was
keeping from him."
      Ignoring her firing, Theresa went back to work at the clinic. Ludwig did not remind her that
he had fired her, and "everything was calm for a couple of days until it came up again." After
that, she said that she "would pacify him and agree with him" so that he would not "be back up
in Ennis bothering mother and Joe."
      Theresa said that, by Christmas of 1989, Ludwig had added her Uncle Don's name to his
complaints. "Joe and Don committed fraud in the way that they got, in his opinion, got the
property. Joe and Don were having these secret meetings."
      In March 1990, Ludwig came to the clinic and demanded that Theresa go with him for a
discussion. When she refused because a client was in the clinic, he threatened to have her
committed to a psychiatric hospital—"I can get you committed just like that"— and said "any
woman who cares more about a ten dollar rabies shot or a dog than her son's inheritance and . .
. losing hundreds of thousands of dollars has to be committed." After getting the client out, they
went to an 83-acre tract of land that he later purchased.
      About two weeks later, Ludwig went to the clinic "angry and upset . . . more angry than I'd
ever seen him. There was more intensity." After an argument about closing the clinic, she called
Ludwig's brother, Olin, and asked him to come talk to Ludwig because he "was saying he was
going -- very -- he was saying he was going to have to take care of things in Ennis himself, and
he -- there was something in his -- he was different. He was angrier than normal. He was -- I saw
something different is his eye that really scared me." She said it was the first time that she feared
for Joe's physical safety.
      The next day, they went to the 83-acre tract again and discussed "Joe and Ennis." Theresa
testified:
      Q.  What did he say?
. . . 
      A.  He started saying that because I wasn't doing what I needed to do in Ennis, and he was
going to have to take care of it himself, he said that he was just going to have to take Joe
out.
      Q.  What did you take that to mean?
      A.  I knew what it meant. After what I'd seen the day before in his -- I knew he was going
to -- that he was saying he was going to kill him.
      Q.  Did he mention any specific way he would do it?
      A.  He said -- he told me that I didn't know how easy it would be for him to be behind -- I
think he said the big green farm tractor or a round hay baler or the metal barn down
below Joe's barn, and when he came by he'll just blow his brains out.
      Q.  Did he say what he would use to blow his brains out?
      A.  He said he would have a shotgun.
      Q.  Did he seem to know anything about whether or not it would be difficult to get on Joe's
property?
      A.  Well, he made the comment that I didn't know how easy it would be for him to do that
despite Joe's security system and that's --
      Q.  How would he have known about that? Had you been up there recently?
      A.  The only security system I was aware of was an indoor alarm in Joe's house, burglary
alarm, I guess, and that's all I knew about at the time.
      Q.  Did he say anything about your mother?
      A.  Yes.
      Q.  What did he say about her?
      A.  First mentioned Joe and Matt and then he said --
      Q.  What did he say about Matt?
      A.  After he said that he'll just -- he just have to take Joe out, were his words, he said, and
I may just have to take Matt out, too.
      Q.  Did he say why he might just have to take Matt out, too?
      A.  No. Then he brought up mother.
      Q.  What did he say about mother?
      A.  And said that he would take her -- after he took care of mother, that he would kill me. 
And he also in the same conversation had said he was going to take [our son] and go up
there and then --
She said that Ludwig was "more angry and intense than he'd ever been before," that he "spit two
big globs of spit in my face," and that he called her a "bitch" and the "lowest scum of the earth."
      Theresa said that she called Joe to tell him about the threats, but she did not tell her mother,
who was in Houston visiting a friend and whom she saw later that day. She said that she went to
the Harris County Sheriff's Office, "hoping they would put [Ludwig] somewhere," but they were
not helpful at all. She also went to the Family Violence Center of the Harris County District
Attorney's office, but "the end result is they could do nothing." She also testified that Ludwig had
been threatening to report Joe and her mother to the Internal Revenue Service "for undervaluing
Daddy's part of the farm," so that he could claim a reward. After the threats, she reinstated the
visitation schedule in the still-pending divorce and did not return to their home.
      In April, while visiting Joe and Kitty, Theresa saw a steel fence post next to their driveway. 
Later, during a telephone conversation with Ludwig that she taped, he told her to "quit accusing
him of leaning that steel post against Kitty's van." Upon realizing that the post was the one that
she had seen, she took the tape to Joe, met him outside his residence, and played the tape for him. 
      Theresa said that she saw Ludwig on May 30 when the divorce court entered agreed
temporary orders concerning their property. On June 14, a Thursday, while staying at her
cousin's home, she found out that Joe and Matthew had been killed. She attended the funeral on
Monday and went back to court in Houston on Friday to gain control of the clinic, the other
properties, and the records. Later, she found shotgun shells at the clinic and discovered that some
guns that had been wrapped in a pink blanket were missing from their residence. At the
suggestion of her attorney, she informed the Ellis County Sheriff's Department about the shotgun
shells and gave permission for a search of the clinic.
      Mary Catherine Trojacek, Theresa's and Joe's mother, testified about her use of the farm near
Ennis. She said that in the spring of 1989 Ludwig became upset when he found out that her
mother-in-law, Annie Trojacek, had rearranged the way her property would be left at her death. 
She said Ludwig told her that her husband's will "was no good and he was going to break it and
ruin the Trojacek family name." She testified about Ludwig's coming to her property with an
appraiser and said that he was around her property "quite often" after that. She would see his
"distinctive red and cream truck with a black tool box on it" as he was "driving up and down
[Highways] 34 and 660." She believed that she saw him in a different truck that pulled through
a service station in Ennis in March or April of 1990—"he kind of had his hand over his face." She
said that every time she saw Ludwig he would volunteer advice about her property to her "as long
as I would listen." When she heard about Ludwig's threats against Joe, she dismissed them
because "nobody would do anything like that."
      Kitty testified that she and Joe married two years after he graduated from college and that he
worked at Ennis Automotive during all of their marriage. She said that a problem started between
Joe and Ludwig "over the land" and, after that, Ludwig was not welcome in their home. She said,
"He would drive up and down our road at any point during the day, during the week, on the
weekends. We would see him in his truck going back and forth on the road." At the time he was
driving a "cream [colored] truck with like reddish color in the middle, two-tone truck." She said
that in May of 1989, they were returning from a wedding when Ludwig started following them
and followed them towards their home, stopped when they stopped, and followed them back
toward town until they enountered a deputy sheriff. After the deputy received a call, they "went
on home without an escort." The next morning, she met Ludwig "coming down Highway 34
toward our house." Later, he walked in front of her car as she left her church and passed her
again on the road home.
      Kitty said that in April of 1990, she found a fencepost leaning against her van and, assuming
that a neighbor—Keith Spaniel—had placed it there, laid it on the ground. She said that she never
told anyone about it, other than a girlfriend, and later found out that Keith had not left it there. 
She said that she learned of the severity of the relationship between Joe and Ludwig in 1989 and
"was petrified." A "perimeter beam" was installed at their residence after Theresa told Joe about
the significance of the fencepost incident because "we knew it for a fact that he had been on our
property, that he had been watching us, that he had been that close to our house, and Joe felt like
we needed more security, that we needed to know if somebody could get that close." She said that
the security device created many false reports and "became a nuisance," so they turned it off. A
phone was installed in her van and a security gate installed at the end of their driveway. After the
threats were made they prepared wills, and Joe took out credit life insurance on the residence.
      Kitty said that on June 14, 1990, they had dinner at Mrs. Trojacek's home. Joe left for about
an hour or so, and she then followed him home as he drove a tractor. They picked up Matthew
at Mrs. Trojacek's, went to town for ice cream, and returned home. Matthew and Joe were
watching television while she prepared their two daughters for bed. She said that she was in bed,
reading, when she heard a "loud pop." She "knew it was a shotgun blast" and "started screaming
for Joe to answer me." About ten seconds later, there was another blast. She left the girls in her
bedroom and looked down the hall where she "could hear the door popping" and see glass all over
the carpet. She went to the den and could see Joe's head on the couch but could not see Matthew. 
She returned to her bedroom and dialed 911. When the officers arrived, she let them in; later, she
heard an officer telling her mother-in-law, Mrs. Trojacek, that Matthew was dead.
      neighbors
      Steve Fallen, a resident of Ennis who worked at Ennis Automotive, testified that he worked
closely with Joe on a day-to-day basis. He said that several times a month Joe would discuss with
him a problem with regard to some family matters. When Joe asked for advice, he advised him
to get an outside dog, offered to loan him a gun, and reminded him that the Ellis County Sheriff's
Department had an office in Ennis in addition to the main office in Waxahachie. He said that they
increased the security at the business by installing additional video cameras and recorders and
limiting access to the premises. He concluded that Joe was "very frightened for his safety and
[that] of his son." He also said that he knew of no one at Ennis Automotive or in the community
of Ennis or anywhere else that had a grudge against Joe or Matthew.
      Keith Spaniel testified that he lived about three miles from the Trojacek residence and had
worked there doing farm labor. He had worked on the Trojacek farm with Ludwig and said that
Ludwig was more interested in talking about what was going on at the farm than in working. 
Ludwig criticized Joe's running of the farm and asked questions about the ownership of the cattle
and farm equipment. Spaniel said that he made security suggestions to Joe and started carrying
a rifle around May of 1989. He also built a set of steel gates at the end of the driveway and a pipe
fence around the front of Joe's house. He said that he saw Ludwig driving past the Trojacek
residence ten or twelve times, mostly on weekends, that he had never seen him visiting at the
residence, that he had seen him at a motel in Ennis on Memorial Day weekend of 1989, that Joe
was "concerned for security around the house," and that he, Spaniel, had told Joe that he would
shoot Ludwig if he ever saw him on the place "because of the certain threats made by the
defendant on Joe Trojacek and his son, Matthew."
      Wayne Lee testified that he owned The Electronics, an installer of security systems, and that
he installed a basic system in the Trojacek residence in 1987. He said that in 1990, he installed
a system that used external infrared beams surrounding the house that would "pick them up" if
someone walked into the yard, describing it as a very uncommon system. He had installed a
security system in one truck and a van that Kitty drove, put a car phone in the van, and installed
an intercom system and remote opener on the gate to the residence. He and Joe talked about other
types of security devices. He said that he installed a security system at Mrs. Trojacek's residence
and put a tap on her telephone at her request.
      Stuart Hamilton, a surveyor who lived across the highway from Mrs. Trojacek, testified that
he had attended a lodge meeting on Highway 34 outside of Ennis on June 14, 1990. After he left
the meeting at about 9:00 p.m., he saw a dirty dark Chevrolet pickup on Highway 34 driving 35
to 40 miles per hour. He said that he thought the vehicle contained one male. He followed it until
it turned left on Farm Road 660.
      Joe Crase testified that he lived on Farm Road 660, about one-quarter mile from the Trojacek
residence. On June 14, 1990, he and his wife Cynthia were putting out "yard-sale signs." They
travelled south on Farm Road 660 to its intersection with Highway 34, put out signs, then retraced
the route to their home. He said that he saw a new Chevrolet pickup, dark blue or black with
tinted windows, parked on the same side of the road as the Trojacek residence at Village Creek,
which intersects Farm Road 660 between the Crase home and the Trojacek residence. He said he
thought it was a regular-cab pickup with a short bed. He did not see anyone around the truck and
saw it again, passing by his home at about 10:00 p.m., "going fast."
      Cynthia Crase testified that she saw a "new black Chevrolet truck" parked on the east side of
Farm Road 660. She described it as "an extended cab, short bed truck." She also said that the
truck passed their home about 9:45 or so "going real fast."
      Gary Skrivanek testified that he lived on Farm Road 660 between Highway 34 and the
Trojacek residence, about five miles from the latter. He said that he was going home on Farm
Road 660 around 9:15 or 9:20 at night on June 14, 1990, and saw a "new model black extended
cab Chevrolet pickup" parked on the east side of the road at Village Creek. He said he saw no
one around it and took notice of it because he knew no one who owned one like it. 
      law enforcement officers
      A police officer for the city of Ennis, Bill Watson, testified that he was dispatched to the Joe
Trojacek residence on June 14, 1990, accompanied by Sergeant Grady McCall. He said that he
went around to the back of the house, saw a hole in a glass door, and returned to the front where
McCall was talking to Kitty, who was hysterical. She let them inside. They found Matthew, dead
from facial injuries, lying on the floor of the den. Joe was "sitting on the floor leaning back on
the couch with his head tilted back." He had blood on the left side of his head on the neck area
and coming down his left side. Watson said he could not tell whether Joe was conscious or not,
but that he "gasped twice for air." He took no further part in the investigation because it was
within the county's jurisdiction.
      Texas Ranger Robert Medierra of Houston testified that he participated in the investigation. 
He said that about midnight on the evening of June 14 Ranger George Turner, stationed in
Cleburne, requested his assistance in locating Ludwig, who was a suspect in a double killing in
Ellis County. He went to the clinic in Katy and, finding no activity, went to the land near Sealy,
a location that Ranger Turner had given him. Persons living on the property told him that they
had not seen Ludwig in a couple of weeks, so Ranger Medierra went to Ludwig's mother's home. 
Failing to find him there and having received additional information about the residence where
Ludwig and Theresa lived, Medierra went to that address and found no activity. Medierra said
that around 10:00 a.m. on the 15th he received a call from Ludwig's attorney, who "wanted to
know what we wanted with his client." He also received information from an informant that
Ludwig would be going to his attorney's office and "from there they were going to go to
Galveston." He said that the informant said that the purpose of going to Galveston was for
Ludwig "to commit himself to the mental hospital there in John Sealy." Medierra and two other
Rangers went to the attorney's office and, finding Ludwig there, arrested him. When the attorneys
refused to allow Ludwig to give permission for a search of his "brand new truck," the Rangers
requested that it be secured behind a fence.
      Ranger Stan Oldham testified that he accompanied Rangers Medierra and Prince to the office
where Ludwig was arrested. He said that after they were refused permission to search the truck,
they asked if they could "look through" it. When told that they could not, they noted the color
of the truck and attempted to get the vehicle identification number because it had a dealer's license
plate. They could not see into the truck because of the heavy tinting on the windows. He said that
the truck was "extremely clean" and appeared to have been cleaned very recently because there
were no "bug splatterings or anything like that." He noted that dark vehicles pick up dust, but the
truck was "real clean." During the next week they tried to locate the truck but were unable to do
so. He said that Olin Ludwig told Captain Prince that the truck had over a thousand miles on it. 
Oldham testified about a search of the clinic in Katy and of the residence. They discovered no
weapons at either location.
      An investigator for the Ellis County Sheriff's Department, James Whitely, testified that he
arrived at the Trojacek residence at about 10:00 p.m. on June 14 and took photographs of the
crime scene, which were admitted into evidence. He also identified photographs of the exterior
of the residence. He said that the lighting in the den was "average." He described in detail the
location of shotgun pellets that he recovered from Matthew's body, from the couch, from the den
floor, and from a china cabinet on the other side of a den wall. He also recovered two spent
shotgun shells outside the den door—admitted into evidence as Exhibits 88 and 89—and "shotgun
wadding" from the den floor inside the door. Whitely testified that he returned to the residence
the next day and found a footprint 75 feet or so from the house but could not make a cast of it
because of a lack of detail. He also found tire tracks in a grassy area of a road nearby. 
      Ronnie Harris was the Lieutenant of the Criminal Investigation Division of the Ellis County
Sheriff's Department and was in charge of the investigation. He testified that he arrived at the
Trojacek residence on the evening that Joe and Matthew were killed at about 10:00 p.m. and
stayed until about 1:00 a.m. the next day. He examined the alarm system in the residence and one
that "was set up around the perimeter." He saw the two shotgun shells during his walk around
the house. He said that they had only one suspect—Ludwig—and that he returned and searched
the general area the next day until he left for Houston to retrieve Ludwig, who had been arrested. 
He testified that when Ludwig was admitted to the Ellis County jail he noticed "a bruise. It was
believed to be a shotgun hickey." He identified pictures of the bruise that were admitted into
evidence. He said that he had been familiar with the effects on the body of shooting a shotgun
since he was six years old and had observed different types of ammunition and different gauges
of shotguns having differing effects on the body. He stated that the bruise on Ludwig at the time
he was admitted to the jail was consistent with the results of shooting a shotgun. He also said that
Ludwig's clothing was sent to the Department of Public Safety Laboratory in Austin. 
      Harris participated in two searches of the clinic in Katy. On the first occasion they found
nothing, but after Theresa gave them additional information, he returned and retrieved shotgun
shells—admitted into evidence as Exhibits 64-87, a shotgun plug, a knife, a brown leather holster
and belt, and eleven baseball caps from a cardboard box in a storage room. He identified a
photograph of Ludwig taken at the time of his arrest in which he was wearing an identical cap. 
The pink blanket that Theresa had earlier testified held guns was also found at the clinic. He said
that the shotgun shells were submitted to an Alcohol, Tobacco & Firearms laboratory for testing. 

      Based on his observations and those of other officers, Harris said that his opinion was that the
person who fired from the back yard into the Trojacek residence had a clear view of Joe and
Matthew, but he said that it was "possible" that the assailant did not see Matthew. 
      Texas Ranger Captain Bob Prince testified that he was stationed in Houston and was called
upon to assist Ellis County authorities with the investigation. On June 14, he arrested Ludwig at
a law office in Houston. He requested permission to search Ludwig's pickup, but the attorneys
refused, saying that "they would maintain the pickup there at the office." Later, Olin Ludwig
called and said that he had the pickup in his possession and, during a conversation about inspecting
the truck, that it had "somewhere in the vicinity of a thousand miles" on it.
      Ranger George Turner testified that when he arrived at the Trojacek residence Matthew's
body was still there. He walked the area that night with a flashlight and returned the next day. 
He said that his first visit to the clinic and residence in Katy was specifically to search for a
shotgun, but he found only business cards related to firearms and an instruction book for a
Mossberg 12-gauge pump shotgun. On his second visit to the clinic, nothing was found, but he
learned later that Harris had retrieved a box. He said that he was a certified firearms instructor
for the Department of Public Safety and that a shotgun not held properly could leave a "shotgun
hickey" on the shoulder of the shooter. Turner testified on cross-examination:
 Q. Isn't it true that you had made up your mind on June 14th that Mr. Ludwig was the
murderer, that he was educated, he's a veterinarian, you believed that he was smart and he
wouldn't do anything stupid? 
A. No. Knowing there was never any shred of anything that pointed to anyone else other
than your client, Mr. Ludwig. So if you're asking me, did I make up my mind that he was
the killer, most assuredly I did and have.
      other witnesses
      John Compton testified that he worked for Ludwig at the League City Animal Clinic. In 1990
he took Ludwig to Ennis in his truck. After initially denying that Ludwig said anything about
being recognized in his own truck, Compton testified that he told law enforcement authorities in
October of 1990 that he and Ludwig took his truck to avoid any possibility of anyone recognizing
Ludwig's truck. During the trip, they purchased a set of walkie-talkies, a pair of binoculars, and
two flashlights. He said that Ludwig told him that the binoculars were to get a closer look at his
mother-in-law's house to see how his son was doing, the walkie-talkies were for "communication
and to have some backup," and the flashlights were to find "a pathway or something back to the
truck" if it got dark. When they got to Ennis, they drove past his mother-in-law's house, then by
another house that was "more or less in town." Ludwig did not use the binoculars. After stopping
in Ennis, they drove back past the mother-in-law's home and returned to Houston.
      Willie Morillione operated a rental business next door to the clinic in Katy. He testified that
Ludwig visited the rental center during the construction of the clinic and, at times, discussed his
wife's family. He stated, "I think there was some animosity there towards her brother and toward
the mother."
      Ann Morillione testified that she had last seen Ludwig on June 14, 1990, at their rental
business. She identified a sales-ticket to Ludwig for a pair of gloves and said that she recalled his
making the purchase. She said that, contrary to most other occasions on which he would take a
sales receipt, he crumpled up the receipt for the gloves saying, "this was not for [a] business
purpose, it was personal use."


 She said she saw him leave the clinic in a black truck and thought,
"Ron has a new truck." She said that she remarked to Willie that Ludwig was unusually quiet that
day.
      Kyle Tomme testified that he began working at the veterinary clinic in Katy in February or
March of 1990 but only worked there for about a month because he "had become uncomfortable
with some of the arguments and family matters that were going on around the animal clinic." He
said that he was being caught between Ludwig and Theresa, and after Theresa stopped working,
Ludwig continued discussing family matters and the divorce with him. Asked who started the
arguments, he said that Ludwig "would lead them on" and would "just [nag] and pick about the
situation and start talking with her about it." Ludwig "told me at one point after she left that if
she didn't keep their nose out of his business that he would kill them." Tomme took "them" to
mean the "mother and brother of Theresa" because "that's always who the arguments were mainly
directed about." Tomme further testified that, because his own aunt had been raped and he had
expressed to Ludwig a desire to "hurt" whoever did it, Ludwig "explained to me how to kill
somebody, how to use a shotgun because you could claim temporary insanity."
      James Perry, the operator of Houston Moving Service, identified a business record that
showed that Ludwig had moved a rolltop desk, two child's riding toys, a desk chair, a portable
TV, and a child's table and chair from the residence in Katy to his attorney's office in Houston
on June 14.
      Fred Wenck said that, on August 2, 1975, he was working at Tri-State Sporting Goods in
Bryan. He identified a "firearm transaction record" showing that Ludwig bought a Remington
Model 11 12-gauge shotgun on that date.
      Monte Marshall worked for Lawrence Marshall Chevrolet, a dealership in Hempstead. 
Marshall testified that he sold and delivered a black 1990 half-ton Chevrolet extended-cab pickup
with deep-tinted glass in the back window to Ludwig on June 11, 1990.
      Betty Jo Page testified that she met Ludwig at a dance hall in Brenham in May of 1990. She
said that they went out to dinner after that, and she worked for him at the clinic for two days. In
June, she went with him and his mother to Lawrence Marshall Chevrolet in Hempstead when he
purchased a Chevrolet pickup. On June 13 they went to dinner, and on June 14 she found a check
for one month's wages in her mailbox at home. At about 8:00 or 8:30 p.m. on the 14th, she
called his residence, but his niece said that he was not at home.
      A used-car dealer in Houston, Harlan Lane, testified that in July of 1990 he purchased a black
Chevrolet truck, extended cab with a short bed with a red interior and 1,000 to 1,300 miles on it,
from attorney Dan Gursin for $13,000. He said that he did not remember the owner's name, that
he understood that the owner was in prison, but that he received a title signed by the owner. At
the conclusion of Lane's testimony, the court took judicial notice that Dan Gursin had been an
attorney of record for Ludwig in this case and that he was no longer an attorney in the case.
      medical witnesses
      Charles Minor testified that he was a paramedic with the East Texas Emergency Medical
Services. He said that when he went to the Trojacek residence he found a male sitting on the floor
leaning back against a couch and a child on the floor. The male was alive, but unconscious. The
medics stabilized him and transported him to a hospital in Ennis. The child was dead.
      Dr. Jeffrey Barnard testified that he practiced in the field of forensic pathology and was the
Chief Medical Examiner for Dallas County. He stated that he performed an autopsy on Matthew
and explained its function. His examination revealed that Matthew died from a shotgun wound
to the head, from which he recovered three pellets. He said that the path of the shotgun pellets
was "from front to back and it was from right to left. It was -- it really kind of varied from almost
a completely horizontal wound to slightly upward." He had no definite opinion about the range
from which the shotgun had been fired. He characterized the injury as "rapidly fatal" and said
"[a]fter this impact from the shotgun wound, the child would drop immediately."
      An employee of the medical examiner's office in Dallas County, Dr. Emily Ward, testified
that she performed the autopsy on Joe, who had sustained three separate injuries to the head. Her
opinion was that, because one of the shots had gone "right through the brain stem," the injuries
would have been immediately incapacitating. She also found several small injuries to the leg
areas. She recovered two shotgun pellets from the head and two from the thigh.
      Dr. Jean Guez testified that she was a practicing psychologist in Houston. She said that she
had been appointed by the 257th District Court of Harris County to "do a psychological evaluation
of [Ludwig and Theresa] and to make a determination as to the best interest of the child in a
divorce and custody case." She said that Ludwig voluntarily came to her office to be tested on
June 6, 1989. Her data indicated that Ludwig was "a very bright man, high above the average"
but had a "tendency to think about the world differently than it sometimes was." She explained:
He was very meticulous and capable of looking at very small details. As such, he would
sometimes take small pieces of information and reformulate them into a different puzzle that
would render a different conclusion about what was happening or what he was seeing and
experiencing. And his ability to do that was supported by his high intelligence, such that the
smarter you are, the more intellectual power you have. The greater ability to offer some
discrepancy and information.
She said that he takes "information and he chooses selectively that which supports a certain
viewpoint or perception and then he continues along with that perception, even with great
information to the contrary" and that there "may be a tendency to jump to conclusion as well." 
      Dr. Guez acknowledged that Ludwig would look upon certain people as a threat. She said
that, at the time she saw him, Ludwig perceived two categories of threat: his son's future well-being due to his failure to receive a fair share of land being divided up as part of an estate and a
belief "that his brother-in-law had hurt his son." She said that, although he was concerned about
"allegations that were made regarding whether he had a violent temper," in one of the sessions in
August and September of 1989 he "recounted that at the time that he found out about his son being
hurt by his brother-in-law, that he was so enraged and so concerned about the well-being of his
son, that he had decided that he would kill his brother-in-law in order to keep that from happening
again." She said that "his plan included setting up a meeting with Joe on a remote road in his
pickup and a shotgun." She said that she did not feel a duty to warn anyone because "it was not
an imminent plan." She was also satisfied that there had been no abuse of Ludwig's son. 
      Dr. Guez also testified that Ludwig's general feelings toward Joe were that "he was being
cheated by Joe and Theresa was being cheated by Joe and therefore that his son was being cheated
by Joe in terms of the land. . . . He felt [it was] a horrible miscarriage of justice, unfair, selfish,
and designed for Joe to get the majority of the land rather than the two girls in the family." 
Regarding her observations of the way Ludwig perceived threats to his son, Dr. Guez testified:
Q. So if he perceived something as a threat to his control or a threat to what he wanted
to do for his son, how did he deal with that?
A. Well, the threat comes first and the control comes afterwards. It's not that things are
a threat to his control, they're [things] that are a threat to his son and he would want to
exercise his control over the outcome.
Q. And what sort of effect did it have on him if it was something that he couldn't
exercise control over?
A. Well, that increases the threat considerably and his ability to control. And when the
scare increase then he goes along a continuum.
Q. What do you mean by that?
A. When you think of scare on a line from not very much to a lot, it starts out as being
a little scared a little worried. It moves as it gets more intense along this line to what we call
obsessive, which means that you become preoccupied with something and you think about it
a lot and you [chew] on it and you dream about it and you just -- its just present all the time. 
The next step along this line is paranoid. [P]aranoid thinking is an extension of the obsessive
thinking which means that the scare takes on some force against you. People are after me,
they're after my money, they're after my whatever, my wife, my dog, after my practice, after
my son, after something. Somebody's out to get me or out to get my son, in this case, and
the thinking becomes very vigilant against the threat that anybody could be a potential threat
and is likely to do something to take advantage of that person. The next step if it gets very
extreme is delusional.
Q. What do you mean by delusional?
A. Delusional means you come to conclusion about reality that things that are happening
are not happening.
Q. Was that happening with this defendant?
A. In my view from time to time he would start out being worried as we all are, and go
at different times along this continuum. He was not always delusional or paranoid or
obsessive or scared, but it would go along this line, depending on how personal the threat was
and how much feeling he had associated with the threat.
Q. Were you able to reach a conclusion as to how personal this threat was to this
defendant?
A. In my view the greatest distortion and the greatest likelihood of his thinking
inaccurately occurred relative to his son, which was his most prized possession, as it were,
most valued part of his life.
She said that Ludwig was capable of forming the intent to kill a child if he were on the delusional
end of the continuum and felt that the child was that big a threat. "[Ludwig] has a potential for
a violent temper." In response to being asked whether he was capable of committing murder, she
said, "If he was believing that the threat was real to him, I think he would do anything to protect
his child."
      John O'Neil had been a firearms tool mark examiner for the Bureau of Alcohol, Tobacco and
Firearms for four-and-one-half years. He also worked for sixteen years as an examiner for the
Metropolitan Police Department in Washington D.C. O'Neil said that he had testified 445 times
as a firearms expert. He identified the two shells found outside the Trojacek residence—Exhibits
88 and 89—and twenty four other shells—Exhibits 64 through 87—as items that he had examined
by microscopic comparison to determine if they were all fired in the same shotgun. He said that
his examination revealed that the markings on eighteen of the twenty-four shells, all the same
brand as Exhibits 88 and 89, were fired in the same shotgun as Exhibits 88 and 89 and that the
markings were "distinctive to the point of individuality that we could exclude any other shotgun"
as a possibility. He said that the "class characteristics"—the location of the firing pin impression
and the relationship of the extractor, ejector markings—indicated that the shotgun was either a
Remington or a Mossberg. The jury viewed a videotape of O'Neil making the comparison while
he described what was being shown. O'Neil also identified photographs of his microscopic
examinations of the shells.
      O'Neil testified that he had participated in approximately 2,400 homicide investigations in
Washington, D.C. over a sixteen-year period and had given expert testimony in "terminal
ballistics." He explained how the pellets fired from a shotgun move through the air, what they
do on encountering another object, and the possible effects of shooting through glass. Answering
a hypothetical question that assumed the facts revealed by the investigators and the medical
examiners, he said:
Taking all that into consideration, the adult victim with the spreading pattern being to the
head and to the leg was the first shot, that pattern being spread by breaking the glass. The
second shot to the child being a very tight pattern striking in the mouth and exiting was a very
tight pattern being the second of the two shots.
Asked whether he had an opinion about how the assailant could have accomplished the second
shot, he said:
Given the same set of circumstances, in order to see the child through the hole that was
created by the first shot, it would necessitate moving forward and down to see through that
hole then the second shot could be fired, there is a difference in the angle of firing between
the first shot striking the adult and the second shot striking the child.
He also said that, in his opinion, the distance from the muzzle of the weapon to the child was "no
further than nine feet" and perhaps "closer by a foot or two" and that the positions of the child and
adult victims would have required "distinct separate aim points and shots." During cross-examination, O'Neil said that there are twelve pellets in a "12-gauge double ot buck magnum
shell" and that firing one "would leave a bruise on me."
      defense testimony
      The only defense witness was Dr. Robert Jordan, a medical doctor who is board certified in
anatomic and clinical pathology and forensic pathology and was at the time of trial the Deputy
Medical Examiner in Galveston County and a private practitioner. Jordan testified that he had
been furnished measurements from the scene and had examined the autopsy reports and the
pictures of the scene and of Ludwig. He said that the mark on Ludwig when he was arrested was
"not a bruise or contusion." He further said that autopsy reports, police reports, and pictures—the
information relied on by O'Neil—do not give enough information to "draw any conclusion
regarding whether the killer or assailant, what he saw in that room at the time he fired." Basing
his opinion on additional information, such as the distances he was provided and the injuries
sustained by the victims, Jordan testified:
Q. What is the possibility of the person who shot a 12-gauge shotgun, what is the
possibility of that person seeing into the house at night, when shots were fired, the possibility
of seeing Matthew Trojacek?
A. I don't think he saw him.
Q. Is there a possibility that he did?
A. Yes.
Q. Is there a possibility that the person shooting these shots didn't see him?
            A. There is.
In later testimony, Dr. Jordan said:
Well, remember, I said it's possible he did see him or it's possible he didn't. The reason
I'm saying that he didn't see him was due to the fact that the first round caught both
individuals at a level where the child's head would have been, if the child were behind the
father. And if he peeked out to see what was going on, he would have gotten almost the full
charge right in the face. But there was enough pellets to the periphery that also caught the
father in the thigh.
He criticized the opinions given by the medical examiners and disagreed with O'Neil about the
effects of the glass door on the dispersal of the shotgun pellets. 
      Jordan was cross-examined extensively about his opinion concerning which shot hit which
victim. He accepted the fact that the interval between the two shots was ten seconds and verified
that he had not visited the Trojacek residence. On re-direct, he acknowledged that his opinion was
"an educated guess based on facts that [had] been put to [him]." 
conclusion
      We go to the determination of whether there exists an "outstanding reasonable alternative
hypothesis." See Gunter, 858 S.W.2d at 438. Gunter describes the process of analysis:
Thus, if exculpatory aspects of [the evidence] are fully consistent and in harmony with all of
what would otherwise appear to be purely inculpatory circumstantial evidence presented by
the State, then under Carlsen and Butler, both supra, we would be constrained to hold the
evidence insufficient. If, on the other hand, exculpatory aspects of appellant's version of
events necessarily contradict or conflict with inculpatory inferences drawn from other
circumstantial evidence presented by the State, and all of the evidence viewed in the light most
favorable to the prosecution would rationally support a jury verdict of guilt to a degree of
confidence beyond a reasonable doubt, we must hold the evidence sufficient.
Id. at 439.
      Reviewing the record of the trial, we find no suggestion by Ludwig of a reasonable alternative
hypothesis that can be drawn from the evidence. Counsel argued that that case was built on
conjecture and suspicion, and that Theresa lacked credibility; they urged the jury not to accept Dr.
Guez testimony; acknowledging that the shotgun shells were the "link-up to the case," they argued
that "something is wrong" with the scenario that led to O'Neil's examination of those shells; and
they argued that the jury should accept Dr. Jordan's opinion about whether the assailant could see
Matthew. These were essentially attacks on the credibility of the witnesses who testified at trial,
not arguments that a reasonable alternative hypothesis to Ludwig's guilt might be drawn from the
evidence. Credibility of the witnesses and the weight to be given to their testimony are within the
exclusive province of the jury. Williams v. State, 692 S.W.2d 671, 676 (Tex. Crim. App. 1984). 
      On appeal counsel argue two hypotheses: (1) "Nothing in the state's case negates the very real
hypothesis that whoever pulled the trigger on that 12-gauge shotgun specifically intended to kill
Joseph and Matthew Trojacek"; and (2) "Nothing in the state's case negates the very real
hypothesis that the child was behind his father and could not be seen by the assailant." Each of
these assertions is directed towards an alternative hypothesis about the intent of the assailant;
neither asserts that evidence in the record raises a reasonable alternative hypothesis about the
identity of the assailant as someone other than Ludwig. In addition, these assertions depend on
a determination about the credibility to be assigned to the various witnesses—an evaluation we do
not undertake. See Moreno, 755 S.W.2d at 867.
      Viewing all of the evidence in the light most favorable to the prosecution and applying the
Gunter analysis, we find no reasonable alternative hypothesis. See Gunter, 858 S.W.2d at 439. 
The evidence about the assailant's lack of intent conflicts with the inculpatory inferences drawn
from the State's circumstantial evidence. See id. Because it conflicts, it could not form the basis
of a reasonable alternative hypothesis. See id. Thus, we must hold that the evidence is sufficient
for a rational trier of fact to find the essential elements of the offense of capital murder beyond a
reasonable doubt. See Jackson, 443 U.S. at 320, 99 S.Ct. at 2789; Turner, 805 S.W.2d at 427. 
We overrule point six.
LESSER-INCLUDED OFFENSE OF MURDER
      The court instructed the jury only on the offense of capital murder. Point three asserts that
the court erred in failing to include a lesser-included charge on murder. 
      An offense is a lesser-included offense of an offense charged in an indictment (the "greater
offense") if: (1) it is established by proof of the same or less than all facts required to establish the
greater offense, (2) it differs from the greater offense only in the respect that proof of a less
serious injury or risk of injury is sufficient to establish it, (3) it differs from the greater offense
only in the respect that proof of a less culpable mental state is sufficient to establish it, or (4) it
consists of an attempt to commit the greater offense. Tex. Code Crim. Proc. Ann. art. 37.09
(Vernon 1981). A defendant charged with an offense that has lesser-included offenses may be
found not guilty of the offense charged in the indictment but guilty of any lesser-included offense. 
Id. art. 37.08 (Vernon 1981). In determining whether a jury must be instructed concerning a
lesser-included offense, a two-step analysis must be applied. Rousseau v. State, 855 S.W.2d 666,
672-73 (Tex. Crim. App. 1993). First, the lesser-included offense must be included within the
proof necessary to establish the offense charged. Id. at 672. Second, there must be some evidence
in the record that would permit a jury rationally to find that, if the defendant is guilty, he is only
guilty of the lesser offense. Id. (clarifying the test of Royster v. State, 622 S.W.2d 442, 446 (Tex.
Crim. App. 1981) (on rehearing)). If a defendant presents evidence that he committed no offense,
the second prong is not met. Aguilar v. State, 682 S.W.2d 556, 558 (Tex. Crim. App. 1985).
      At the time of this offense, the relevant part of the Penal Code that defined capital murder
stated:
§ 19.03. Capital Murder
(a) A person commits an offense if he commits murder as defined under Section
19.02(a)(1) of this code and:
. . .
(6) the person murders more than one person:
                        (A) during the same criminal transaction; or
(B) during different criminal transactions but the murders are committed
pursuant to the same scheme or course of conduct.
(b) An offense under this section is a capital felony.
Tex. Penal Code Ann. § 19.03(a), (b) (Vernon 1989). "Murder," the term used in section
19.03(a)(6), is defined in section 19.02, which provides:
§ 19.02. Murder
(a) A person commits an offense if he:
(1) intentionally or knowingly causes the death of an individual;
(2) intends to cause serious bodily injury and commits an act clearly dangerous to
human life that causes the death of an individual; or
(3) commits or attempts to commit a felony, other than voluntary or involuntary
manslaughter, and in the course of and in furtherance of the commission or attempt, or
in immediate flight from the commission or attempt, he commits or attempts to commit
an act clearly dangerous to human life that causes the death of an individual.
Id. § 19.02 (Vernon 1989).
      The application paragraph of the charge required the jury to find that:
RONALD DAVID LUDWIG did then and there intentionally or knowingly cause the death
of an individual, MATTHEW DAVID TROJACEK, by shooting him with a firearm, to-wit:
a shotgun; and that the defendant, RONALD DAVID LUDWIG, did then and there
intentionally or knowingly cause the death of an individual, JOSEPH DAVID TROJACEK,
by shooting him with a firearm, to-wit: a shotgun.
      Ludwig's rationale is that, because the State was required by the charge to prove that he
"intentionally" murdered more than one person during the same criminal transaction and because
there is evidence that the assailant was not aware of Matthew's presence when he fired the
shotgun, the evidence raises the lesser-included offense of murder. Essentially, he says that
murder as defined by section 19.02(a)(2) is not available to the State as the second murder
described in section 19.03 because the indictment specifically stated that he "intentionally"
murdered both Joe and Matthew. 
      Ludwig points to the testimony of Dr. Jordan, who based his testimony on the photographs
and measurements taken at the Trojacek residence, the offense reports, the autopsy reports, and
other facts and testified that he "did not think" that the assailant saw Matthew. Dr. Jordan believed
that the physical evidence showed that the first shot was aimed at Joe but hit Matthew and struck
Joe only in the thigh. He said he thought that the second shot hit the then moving father. He
testified:
[T]he child's height is such that if he were sitting or getting up at the time the shot was
fired, the angle of sight from the door he wouldn't have spotted him, he was only three feet
eight inches tall.
Ludwig's pro-se brief also points out that Ronnie Harris, an Ellis County Deputy Sheriff, testified
that it was "possible" that the assailant did not see the child. 
      The State—pointing out that Dr. Jordan said his opinion was a "possibility," was a "guess as
good as anyone else['s]," was "an educated guess," and was a "theory"—argues that Ludwig
"failed to raise any evidence that the murder of Matthew Trojacek was of the type defined under
Section 19.02(a)(2) as opposed to 19.02(a)(1)." Additionally, the State points out that section
6.04(b)(2) of the Penal Code would "make the murder of Matthew Trojacek intentional under
section 19.02(a)(1)." See id. §§ 6.04(b)(2), 19.02(a)(1). In support of its position, the State cites
Aguirre v. State, 732 S.W.2d 320 (Tex. Crim. App. 1987) (on rehearing), and Thompson v. State,
691 S.W.2d 627 (Tex. Crim. App. 1984), cert. denied, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d
153 (1985). In Aguirre, the person whom the defendant intended to kill was not killed; rather, the
defendant "fired through the door [intending] to kill his former wife and that felonious intent
transferred over to the killing of the child." Aguirre, 732 S.W.2d at 326. In Thompson, the
appellant asserted that the "State bears a greater burden in proving the culpable mental state of
`intent' in a capital case since `the language of V.T.C.A., Penal Code Sec. 19.03(a)(2) requires
an intentional killing over and above the intentional killing set out in the (non-capital) murder
statute.'" Thompson, 691 S.W.2d at 630. The Court held that the standard for reviewing the
sufficiency of the evidence of an intentional killing is the same for both murder and capital murder
and that the state was entitled to the presumption that arose from the use of a deadly weapon. Id. 
We see no reason to apply a different rule here. 
      The State further argues that a charge on the lesser-included offense was not required because
section 6.04(b) of the Penal Code makes Ludwig responsible for capital murder even if he only
intended to kill Joe. Section 6.04(b) provides:
A person is nevertheless criminally responsible for causing a result if the only difference
between what actually occurred and what he desired, contemplated, or risked is that:
                  (1) a different offense was committed; or
                  (2) a different person or property was injured, harmed, or otherwise affected.
Tex. Penal Code Ann. § 6.04(b)(2) (Vernon 1974). In Lewis v. State, however, the Court of
Criminal Appeals stated "[w]e need not decide . . . whether § 6.04(b)(1) applies to prosecutions
for Capital Murder as the jury in this cause was not authorized to convict appellant under it,"
recognizing that a jury is not authorized to impose criminal responsibility for the unintended
consequences of intentional, felonious conduct when that theory is not submitted to the jury in the
application paragraph of the charge. Lewis v. State, 815 S.W.2d 560, 562 (Tex. Crim. App.
1991), cert. denied, ——— U.S. ———, 112 S.CT 1296, 117 L.Ed.2d 519 (1992). Thus, we
reject the State's contention.
      Ludwig notes that the indictment and application paragraph of the charge required specific
intent to kill Matthew. He then cites Kinnamon v. State, 791 S.W.2d 84 (Tex. Crim. App. 1990),
in support of the statement, "Such intent or knowledge must be specific and must be directed
toward the named conduct, i.e., the death of Matthew Trojacek." Kinnamon is distinguishable on
two bases: first, the charge was brought under a different section of the capital murder statute than
is involved here, and second, the jury instructions are different. There, the jury was instructed:
A person acts intentionally, or with intent, with respect to the nature of his conduct or to a
result of his conduct when it is his conscious objective or desire to engage in the conduct or
cause the result.
Id. at 87 (emphasis added). Kinnamon requested a definition, which the court refused to give, that
read:
A person acts intentionally or with intent with respect to the nature of his conduct or to a
result of his conduct when it is his conscious objective or desire to cause the result.
Id. The Court of Criminal Appeals said, "[I]n the context of this case, we hold that the disputed
`engaged in conduct' language which the trial court refused to exclude from the definitional
portion of the jury charge was irrelevant with respect to the defendant's culpable mental state." 
Id. at 89. Here, the court did not use the "engage in conduct" language disputed in Kinnamon;
this charge read, "A person acts intentionally, or with intent, with respect to a result of his conduct
when it is his conscious objective or desire to cause the result." Thus, Kinnamon is not
applicable.
      Other cases that Ludwig relies on were decided prior to the decision in Rousseau, 855 S.W.2d
at 672-73. In Rousseau, the Court of Criminal Appeals modified the test that it had previously
applied by adding the phrase "that would permit a jury rationally to find" to the second prong. 
Id. at 773.
      The Court of Criminal Appeals has held that even a defendant's testimony that he had no
intent to kill, standing alone, will not necessarily require a charge on the lesser-included offense
of aggravated assault. Godsey v. State, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986). This is
because a statement made by a defendant "cannot be plucked out of the record and examined in
a vacuum." Id. (reviewing court must examine all of the evidence and determine in the context
of the facts if the lesser-included offense was raised). Ramos v. State, 865 S.W.2d 463, 465 (Tex.
Crim. App. 1993), reaffirmed this proposition. Thus, we consider Dr. Jordan's testimony in the
context of all of the evidence and not in a vacuum.  Although the evidence presented through Dr.
Jordan was directed towards showing that the assailant did not see Matthew, and thus did not
intend to kill him, the overall thrust of Ludwig's position at trial was that the evidence did not
sufficiently link him to the shooting to justify a finding that he was the assailant. Given that
Ludwig primarily defended the charge on the basis that he was not guilty at all and not on the basis
that he did not intend to kill Matthew, a rational jury would first decide from the circumstantial
evidence whether Ludwig was the assailant. The jury obviously decided that issue against him. 
Then, being confronted with evidence of (a) two shots being fired ten seconds apart, (b) O'Neil's
opinion that Joe was killed by the first shot and Matthew by the second, (c) no evidence of an
outcry by Joe or response to Kitty's screams "for Joe to answer [her]," (d) the history of Ludwig's
attitude towards his in-laws, (e) the threat that he made specifically against Matthew, (f) Jordan's
and Harris' opinion that it was only "possible" that the assailant did not see Matthew, and (g) the
other facts and circumstances of this offense, no rational jury—having found that Ludwig was the
assailant—would believe that he did not intend to kill Matthew also. We find that the second
prong of the Rousseau test was not met. See id. Thus, we hold that Ludwig was not entitled to
a charge on the lesser-included offense of murder.
      Finally, even if a lesser-included charge were required, we would find that the failure to give
such a charge did not actually harm Ludwig. See Ross v. State, 861 S.W.2d 870, 877 (Tex. Crim.
App. 1993) (on rehearing) (applying Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App.
1984) (on rehearing), to a failure to give requested lesser-included offense charge). When
reviewing allegations of charge error, an appellate court must undertake a two-step review: first,
the court must determine whether error actually exists in the charge, and second, the court must
determine whether sufficient harm resulted from the error to require reversal. Abdnor v. State,
No. 235-93, slip op. at 6 (Tex. Crim. App. Jan. 26, 1994); Almanza, 686 S.W.2d at 171. The
burden lies with the defendant to persuade the reviewing court that he suffered some actual harm
as a result of the charging error. Abdnor, slip op. at 7. 
      As we have stated, Ludwig did not defend the charge on the basis that he did not intend to kill
Matthew. Thus, even after being instructed on a lesser-included charge of murder, the jury would
still initially inquiry whether it could find from the circumstantial evidence that Ludwig was the
assailant. Having made that determination, it would logically find at a minimum that he had the
intent to murder Joe and was guilty of murdering Matthew because he committed a felony (murder
of Joe) and in furtherance of that murder committed an act clearly dangerous to human life (firing
a shotgun into a residence) that caused the death of an individual (Matthew). See Tex. Penal
Code Ann. § 19.02(a)(3). Having convicted Ludwig of the murder of two in-laws, one a five-year-old child, we believe that any rational jury would have assessed life in prison. Thus, we
cannot say that the failure to include a charge on the lesser-included offense of murder actually
harmed him. See Almanza, 686 S.W.2d at 171. Point three is overruled.
THE "SHOTGUN HICKEY"
      Point four asserts that the court should not have admitted evidence of the "shotgun hickey"
on Ludwig's shoulder because the evidence was obtained as a result of an illegal arrest. 
Although a warrant for Ludwig's arrest was issued in Ennis on the same day, none had been
issued by 1:00 p.m. on June 15, 1990, when he was arrested by Texas Rangers in Houston. 
During the "booking-in" process at the Ellis County jail, officers noticed the "shotgun hickey" and
photographed it. Ludwig filed a motion to suppress the evidence; the court denied the motion.
       In a suppression hearing, the trial judge is the sole and exclusive trier of fact and judge of the
credibility of the witnesses as well as the weight to be given to their testimony. Romero v. State,
800 S.W.2d 539, 543 (Tex. Crim. App. 1990). He may choose to believe any or all of the
witnesses' testimony. Meek v. State, 790 S.W.2d 618, 620 (Tex. Crim. App. 1990). The findings
of the trial court should not be disturbed absent an abuse of discretion. Cantu v. State, 817
S.W.2d 74, 77 (Tex. Crim. App. 1991); Meek, 790 S.W.2d at 620. If the findings are supported
by the record, the only question on appeal is whether the court improperly applied the law to the
facts. Romero, 800 S.W.2d at 543.
      Ludwig attacks the validity of the warrant, asserting that the underlying affidavit was
deficient. The State's position is that the arrest was valid in the absence of a warrant because it
was permitted under article 14.04 of the Code of Criminal Procedure. We agree that this arrest
must be tested by the rules governing warrantless arrests.
      A police officer may arrest an individual without a warrant only if (1) there is probable cause
with respect to that individual and (2) the arrest falls within one of the exceptions specified in
articles 14.01-14.04 of the Code. Lunde v. State, 736 S.W.2d 665, 666 (Tex. Crim. App. 1987);
Tex. Code Crim. Proc. Ann. arts. 14.01-14.04 (Vernon 1977 & Supp. 1994). Article 14.04
provides:
Where it is shown by satisfactory proof to a peace officer, upon the representation of a
credible person, that a felony has been committed, and that the offender is about to escape,
so that there is no time to procure a warrant, such peace officer may, without warrant, pursue
and arrest the accused.
Tex. Code Crim. Proc. Ann. art. 14.04. Thus, under article 14.04, there are four basic
requirements that must be met to effect a valid warrantless arrest:
(1) the person who gives the information to the peace officer must be credible;
(2) the offense must be a felony;
(3) the offender must be about to escape; and
(4) there must be no time to procure a warrant.
Id.; Crane v. State, 786 S.W.2d 338, 346 (Tex. Crim. App. 1990). 
      A review of the record reveals that Ronnie Harris, a Deputy of the Ellis County Sheriff's
Department, contacted the Rangers and requested that Ludwig be arrested. Harris testified that,
at the time he made the request, he was preparing affidavits for a warrant of arrest because he had
information that:
      1.   the victims had been killed by a blast from a 12-gauge shotgun fired through the door of
their home;
      2.   Ludwig had been engaged in a "long-term acrimonious dispute" with members of the
Trojacek family;
      3.   Ludwig had threatened to kill Joe using the same means as used in the offense;
      4.   Ludwig had threatened to kill Matthew;
      5.   Ludwig knew how to evade the security system at the Trojacek residence;
      6.   a dark pickup truck had been seen in the vicinity of the crime scene; and
      7.   Ludwig had purchased a dark pickup truck within the past week.
Harris testified:
      Q.  At the time you were preparing these affidavits, did you know where this defendant was?
      A.  No, I didn't.
      Q.  Were various law enforcement agencies trying to find out where he was?
      A.  Yes, sir.
      Q.  And before the affidavits and arrest warrants were finished, did you receive information
that they had found him?
      A.  Yes, we did.
. . . 
      Q.  At the time you began these affidavits, though, you didn't know where he was?
      A.  (Witness indicating in the negative.)
THE COURT: We need a verbal response for the record.
                  THE WITNESS: No, sir.
      Q.  (By [the prosecutor]) But you had reason to believe that Ronald David Ludwig had, in
fact, committed a felony; is that correct?
      A.  That's correct.
      Q.  And he wasn't at any of his -- any of the addresses or any known locations during the
time y'all had looked for him?
      A.  No, sir.
      Q.  As far as you were concerned, he was either in the process of attempting an escape or had
escaped detection?
      A.  At the time we started these affidavits, yes, sir.
The State says that, because Ellis County authorities did not know Ludwig's whereabouts and were
unable to locate him at any of his known addresses or locations, they were justified in believing
that he was attempting to escape or had escaped. 
      When they arrested Ludwig in Houston, the Rangers were in possession of information
received by radio and telephone that Ludwig was from Houston and might be located there. They
also had received information that he was "going to Galveston." The offense was a felony;
viewing the totality of the circumstances, the evidence adduced at the suppression hearing supports
the conclusions that Harris, the requesting officer, had gathered information from credible persons
that he transmited to the Rangers, that both he and the Rangers believed that Ludwig might escape,
and that there was no time to procure a warrant. See Crane, 786 S.W.2d at 346; Tex. Code
Crim. Proc. Ann. art. 14.04. Thus, we find that the court did not abuse its discretion in denying
the motion to suppress the testimony and photograph about the "shotgun hickey." We overrule
point four.
HEARSAY OBJECTION
      Point five complains that the court admitted testimony from an officer about his brother's
estimate of the mileage reflected on the odometer of Ludwig's truck. The State's position at trial
was that Ludwig's new pickup's odometer would reflect one trip from Houston to Ennis and
return. Ranger Captain Prince testified over Ludwig's objection that, when asked about the
mileage on the truck, Olin Ludwig said that it was somewhere in the vicinity of a thousand miles. 
The State concedes that the statement was hearsay but suggests that, prior to Prince's testimony,
Ludwig had elicited the same information during cross-examination of Ranger Medierra, by
asking:
      Q.  So at 4:20 Ron Ludwig's brother calls you at the Houston office and tells your office and
your investigators that he would take the truck, correct?
      A.  That's what I was told. I didn't talk to him.
      Q.  And he tells you that he checked the odometer and it had over a thousand miles on it?
      A.  I think that's what he told Captain Prince.
      As a general rule, any error in admitting evidence is cured when the same evidence is
admitted through another source. Hudson v. State, 675 S.W.2d 507 (Tex. Crim. App. 1984). 
Even if it were error to admit this hearsay testimony through Captain Prince, the error cannot be
said to have contributed to Ludwig's conviction or punishment. See Tex. R. App. P. 81(b)(2). 
Inadmissible evidence can be rendered harmless if other evidence at trial is admitted without
objection and it proves the same fact that the inadmissible evidence sought to prove. Mayes v.
State, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991). We overrule point five.
LUDWIG'S PRO-SE POINTS
      As noted above Ludwig's pro-se brief, considered here in the interest of justice, adopts points
one, two, three, four, and six of his counsels' brief. Three of his additional points will be
discussed briefly here and the final point, ineffective assistance of counsel, as the concluding point
of this opinion.
evidence not admitted
      Ludwig asserts in point seven that the court erred in failing to admit into evidence a letter
written by Theresa. He has, however, failed to preserve this point for our review in that our
examination of the record reveals no such letter that was offered into evidence or that the court
ruled inadmissible. See Tex. R. App. P. 52(a). We have reviewed Theresa's testimony carefully
and find no reference to a letter that was marked or identified by her as an exhibit. Nothing has
been preserved for appellate review. See id. We overrule point seven.
challenges to veniremen for cause
      Ludwig's eighth point is that the court erred in failing to sustain his challenges of "many
veniremen" for cause. The voir dire examination of the individual members of the jury panel
occupies more than 2,300 pages of the statement of facts. Ludwig does not identify which jurors
were challenged for cause nor direct our attention to questions and answers that demonstrate any
basis for a challenge of any member of the jury panel for cause. See Tex. R. App. P. 74(d). In
fact, the transcript affirmatively shows that the jurors selected, Paul, Hancock, Montgomery,
Morgan, Watts, Maxwell, Plemons, Williams, Jock, Nichols, Milton, and Waller, were not
challenged for cause or peremptorily by either party. Point eight is overruled.
jury shuffle
      Point nine contends that the court denied a timely demand to shuffle the jury panel. Ludwig
was charged with a capital offense and a special venire was assembled. Prior to the beginning of
the individual questioning, the court granted the State's request that the panel be shuffled. Ludwig
objected to the shuffle. His counsel stated: "[W]e just want to put on the record the reason we
believe that they're asking for a shuffle is that in the first three rows, there's approximately 14
black people . . . and that could only be the logical explanation in asking for a shuffle since they
don't know anybody's background other than their home, their age, where they come from in
[Navarro] county, and their race." After the jurors were reseated, Ludwig requested another
shuffle. The court denied his motion.
      Article 35.11 applies to capital murder cases. Chappell v. State, 850 S.W.2d 508, 509 n.4
(Tex. Crim. App. 1993) (citing Hall v. State, 661 S.W.2d 113, 115 (Tex. Crim. App. 1983)). 
Article 35.11 mandates that a defendant has an absolute right to a shuffle of the jury panel; it does
not, however, mandate that he be allowed to reshuffle the panel after the state has caused the panel
to be shuffled, absent some misconduct in the state's shuffle. Jones v. State, 833 S.W.2d 146,
147-49 (Tex. Crim. App. 1992). Here, there is no showing that the shuffle done at the request
of the State was anything other than proper. See id. We overrule point nine.
ineffective assistance of counsel
      Finally, Ludwig's pro-se brief asserts in point ten that he was denied the effective assistance
of counsel. He states, in support of his contentions, that his attorneys failed to seek out witnesses
suggested by him; failed to "object to Joseph Trojacek's nonverbal conduct in response to a tape
recorded message," which was hearsay; failed to provide an adequate appeal brief; failed to have
him examined by a physician on the morning after his arrest, a procedure that would have yielded
evidence contradicting the "shotgun hickey"; failed to investigate a report of a truck with
"Hemphill" on it; failed to have the shotgun shells tested by an independent expert; failed to have
a palm print analyzed; asked a question of an expert that inferred his guilt; failed to object to other
hearsay; failed to inform him of a plea bargain; and failed to object to certain statements that the
prosecutor made. Additionally, he says that the attorneys had a conflict of interest because they
were "coerced by [Theresa's divorce attorney] into being completely prejudiced" against him. 
Because these allegations were not presented in a motion for new trial and no evidentiary hearing
has been held on them, there is no basis in the record on which to analyze many of them.
      To prevail on this point, Ludwig must meet the two-pronged test used to analyze claims of
ineffective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,
80 L.Ed.2d 674 (1984); Stafford v. State, 813 S.W.2d 503, 505-06 (Tex. Crim. App. 1991); see
also Hernandez v. State, 726 S.W.2d 53, 54-56 (Tex. Crim. App. 1986) (adopting the Strickland
standard). First, he must show that his trial counsel's performance was so deficient, because he
made errors of such a serious nature, that he was not functioning as the "counsel" guaranteed by
the Sixth Amendment. Id. Second, he must demonstrate that the deficient performance so
prejudiced his defense that he was deprived of a fair trial, i.e., that there is a reasonable
probability that, but for his counsels' unprofessional errors, the result of the proceeding would
have been different. Id. A reasonable probability is a probability sufficient to undermine
confidence in the outcome. Jimenez v. State, 804 S.W.2d 334, 338 (Tex. App.—San Antonio
1991, pet. ref'd).
      A claim of ineffective assistance of counsel must be determined upon the particular facts and
circumstances of each individual case. Id. A strong presumption exists that counsel rendered
adequate assistance and made all significant decisions in the exercise of reasonable professional
judgment. Stafford, 813 S.W.2d at 506. Stated another way: Counsel's competence is presumed,
and the party asserting ineffective assistance must rebut this presumption by proving that his
attorney's representation was unreasonable under prevailing professional norms and that the
challenged action was not sound trial strategy. See id. Allegations of ineffective assistance of
counsel will be sustained only if they are firmly founded. Jimenez, 804 S.W.2d at 338. The fact
that another attorney might have pursued a different course of action or tried the case differently
will not support a finding of ineffective assistance of counsel. Id.
      For a determination of the totality of the circumstances, we will review counsels' performance
as demonstrated by the record. The record shows that Ludwig's attorneys filed motions:
      •    to disqualify the trial judge,
      •    to declare the statutory oath for jurors in a capital case unconstitutional and asking the
court not to require that oath,
      •    to set aside the indictment because the capital murder statute is unconstitutional and
because of systematic exclusion "of Grand Jurors on the basis of race and age,"
      •    to prohibit the mention of extraneous offenses,
      •    to suppress evidence taken as a result of his arrest and as a result of a search of premises
in Katy,
      •    to discover the criminal record of the State's witnesses,
      •    to discover and inspect evidence in the possession of the State,
      •    for change of venue,
      •    for an in-camera inspection of the State's entire file,
      •    to take depositions,
      •    for dismissal of the capital murder charge based on selective prosecution and exclusion
of a fair cross-section of the population as jurors,
      •    to enforce the court's order that the State elect which charge it would prosecute,
      •    to alternate the parties' right to question prospective jurors first,
      •    in limine,
      •    to videotape the jury selection process,
      •    for proposed instructions in the court's charge,
      •    for disclosure of hypothetical questions about future dangerousness,
      •    to preclude displays of emotion by the victims' family in the courtroom,
      •    to prohibit jury dispersal and exposure of the jury to the victims' family or friends, and
      •    to exclude evidence of unadjudicated extraneous offenses during the punishment phase. 

      Hearings were held on various pretrial motions, including the motions in limine, the motion
to suppress the evidence obtained as a result of the arrest and the searches of the residence and
clinic, a motion to recuse the trial judge that was denied, and a motion to change venue that was
granted. At each, Ludwig's attorneys participated fully, objecting to testimony and exhibits and
examining and cross-examining witnesses.
      During the individual voir dire examinations of the prospective jurors, counsel asked
appropriate questions, sought and obtained rulings that panel members be excused for cause,
excused other members by agreement, exercised all of the peremptory challenges allowed, and
requested additional strikes.
      An opening statement (1) painted a picture of Ludwig as "a 22-year old man when he
graduated from vet school, a promising career, a man who married, divorced, remarried, who is
in love with his wife, Theresa Trojacek, who adored his son, and his nephews"; (2) called the
jury's attention to the State's burden of proof; (3) suggested that "our Constitution doesn't allow
hearsay and innuendo and skepticism to come into play when you have to decide this case"; (4)
criticized the investigation, saying that the officers "failed horribly, negligently"; (5) reminded the
jury that he would "scrutinize, I'll cross-examine, I'll rationalize with witnesses. I'll comb every
word they say . . . ."; and (6) suggested that the State's evidence would be "inconclusive,
unacceptable, maybe's, could be's, should be's, looks that way, could be that way, might be that
way, is inconclusive . . . to allow you to convict . . . ." Immediately prior to the beginning of
testimony, the attorneys asserted a motion in limine, the majority of which was granted, and
assured that all pretrial rulings and rulings from a prior trial were on the record. 
      During Theresa's testimony, the attorneys objected to answers they deemed to be privileged,
irrelevant matters, hearsay, repetitious and leading questions, and testimony relating to items
found in the searches of the clinic. They cross-examined her extensively about how she and
Ludwig met, their early relationship, their business relationship, her feelings about Ludwig's prior
marriage, their plans, their engagement and marriage, how they handled their money and property,
and their relationship with their son. They also questioned her about Ludwig's nature, his
character, and their "blow-ups," about the sale of the veterinary clinic in League City, their "time
off," and the construction of the new clinic in Katy, about their visits to Ennis and the family
relationship prior to her father's death, about Ludwig's expectations of her both in their business
and in her dealings with her family, and about their different approaches to accomplishing the
same results. They questioned her about the divorce and their attempt at reconciliation, about how
she had benefitted financially since Ludwig's arrest, about her operation of the clinic and handling
of the property and money, about her giving permission to search the clinic after Ludwig was
arrested, and about whether she was being vindictive and "trying to get revenge." 
      They cross-examined John Compton about Ludwig as an employer and the way he treated
clients—obtaining favorable testimony. Compton said that he saw no difference in Ludwig when
the divorce proceeding started. He also said that when they took the trip to Ennis they never got
out of the truck. 
      During cross-examination, Willie Morillione stated that Ludwig had good manners, was very
interested in the construction of the clinic, and appeared to be a good father.
      Counsel cross-examined Kyle Tomme about his relationship with Ludwig and Theresa and
elicited testimony that Ludwig was "surprised" and "hurt" when she left. He said that Ludwig was
a good father and that he had never seen a shotgun, rifles, ammunition, or shells in the clinic. He
said that nothing in their relationship would make him believe that Ludwig was a violent person.
      Cross-examination of Officer Watson centered on the amount of light that he could see in the
den when he went to the back of the Trojacek residence and whether he had ever given a statement
about what he saw. Cross-examination of the paramedic was limited to establishing his lack of
observation of lighting and of the presence of glass in the den because those items were not his
responsibility.
      Questioning of Ranger Medierra revealed that Ludwig did not try to run or hide when the
Rangers confronted him and that all of the information that he had about the case came from
Ranger Turner, raised questions about Ludwig's giving them permission to search the vehicle, and
inquired about why they had no search warrant for the vehicle when they arrested Ludwig. 
Ranger Oldham was questioned about the nature of the search of the clinic and his failure to find
any weapons and about the search of the residence and of Ludwig's land. Counsel also inquired
whether the Rangers had told Olin Ludwig that they wanted to search the truck. They also made
a bill of exception of testimony by Oldham.
      Deputy Whitely was asked about his qualifications and experience as an investigator, the
method used to gather evidence at the crime scene, and—through extensive questions designed to
show that Whitely did not follow procedures recommended by the Federal Bureau of
Investigation's Handbook of Forensic Science—the types of evidence that Whitley did not gather
at the scene, from Ludwig, or from his vehicle. Whitley testified that he did not establish where
Joe or Matthew were at the time they were shot.
      Cross-examination of Ronnie Harris began with his admitting that the case was built on
circumstantial evidence and continued with questions about why the earlier search of the clinic had
revealed nothing and why Theresa had waited from five to seven days to report the items found
there to law enforcement authorities. Harris was further questioned about his experience and
training and what he did and did not do in connection with the investigation. He was also
questioned about the factual basis for the affidavit on which the arrest warrant was issued and the
findings of the Department of Public Safety lab. As noted above, Harris said that it was
"possible" that the assailant did not see Matthew.
      Cross-examination of James Perry suggested that the items were moved to Ludwig's
attorney's office to comply with orders in the divorce case and revealed that Perry had no idea
about the reasons that Ludwig may have moved them. Counsel established through Wenck that
Ludwig's purchase of the shotgun was legal.
      Captain Prince said on cross-examination that he had no problems in arresting Ludwig, who
followed his instructions.
      Monte Marshall said that there was nothing unusual about the sale of a pickup to Ludwig and
that his company sells 150 extended-cab pickups a month. Marshall stated that "this type of truck
is just everywhere," and "A new vehicle is just kind of like a toy, you want to use it." He also
said that most of the pickups that they sold had tinted glass and that window glass looks dark at
night whether tinted or not. During the cross-examination of Marshall, the defense introduced
affidavits showing (1) that 82,863 1990-model Chevrolet extended-cab pickups were made from
the beginning of production through May 19 and (2) the number of pickups that were registered
in Texas from October 1989 through May 1990, ranging from a low of 1,108 in October to a high
of 1,924 in May. 
      Dr. Barnard said on cross-examination that he had taken blood from Matthew and submitted
it to the criminal investigation laboratory in Dallas and that he had seen no information about
where Joe and Matthew were before the shots were fired. The limited cross-examination of Dr.
Ward was confined to her opinion that Joe was "seated on the floor" when shot.
      Ranger Turner was cross-examined about having only a circumstantial-evidence case, not
finding any evidence during his searches of the clinic, finding only carefully-laid-out firearms
brochures on his search of the residence, why additional physical evidence had not been gathered
at the Trojacek residence, a statement that Theresa had given "[reviewing] her entire life with
Ronald Ludwig and the events coming up to June 14th," the information that he received from her
divorce attorney, their failure to ever examine Ludwig's pickup, and whether he had "determined
that [Ludwig] was the murderer, and now you had to get evidence to prove it."
      The defense cross-examined Spaniel about Ludwig's relationship with Matthew and his own
son and his taking them fishing, Ludwig's working to clean up a flood at the Trojacek residence,
and about his lack of knowledge of the reason Ludwig purchased gloves.
      Cross-examination of Hamilton centered on his friendship with the Trojacek family and the
large number of pickups that he saw on a regular basis in Ellis County. On cross-examination,
Joe Crase admitted that he had not seen an extended cab truck on Farm Road 660 that night. Mrs.
Crase and Skrivanek both said that they did not see a window-sticker or paper tag on the truck. 

      The attorneys cross-examined Dr. Guez about her credentials, the inexactness of her
profession, her conversations with Ludwig, his attendance at her sessions, his "distorted thinking,"
and his feelings towards Theresa. Specifically, she was asked about an earlier conversation that
they had with her and whether she at that time opined that Ludwig did not have the ability to
intend to kill Matthew. She agreed that she told the attorney that Ludwig would not intentionally
take Matthew's life. She said that Ludwig referred to two instances in Ennis involving his
son—one where his grandmother hit him with a fly swatter and one where Joe hit him in the face. 
She admitted that, if a child is harmed, a parent's outrage would be "a typical response." She said
her report to the appointing court did not mention that Ludwig had a propensity for violence, that
he had threatened anyone, or that he needed hospitalization or care, while recommending that he
have visitation and possession of the child. She said that he had never, in her presence, exhibited
violent behavior, raised his voice, been disrespectful, or been rude. She observed Ludwig to be
"very loving" with his son.
      Cross-examination of Kitty was about Joe's relationship with Ludwig and the family's
relationships in general.
      Betty Jo Page was cross-examined about the number of times she talked to Ludwig on the
phone. She said that he "seemed like a very sweet and kindhearted person." She had been to the
residence in Katy, and they had talked "very briefly" about his divorce. She said that he "loved
his son very much" and he "just felt hurt." 
      Harlan Lane said on cross-examination that his purchase of the pickup was open and honest. 
He said that the truck had a Lawrence Marshall red paper license plate when he got it. When the
court took judicial notice of Gursin's status as an attorney for Ludwig, counsel sought and
received an instruction that the jury was "not to infer anything one way or the other" about his
absence from the trial.
      During John O'Neil's testimony, counsel renewed an earlier objection, which the court
overruled, to the introduction of the videotape. They further objected to O'Neil's narration of the
videotape, to the introduction of the photographs of his comparisons, and to portions of his
testimony on "terminal ballistics." They cross-examined O'Neil about his experience as an
investigator and the type of information that an investigator considers important. They also
questioned him from the photographs of the scene and about the positions of the victims before
they were shot, the accuracy of his estimate of the distance the shotgun was from the child when
fired, his opinions that the assailant must have seen the child and had to have changed positions
between shots, his examination of the shells, and whether shooting a shotgun bruises everyone.
      The defense team objected at appropriate times to evidence being offered by witnesses for the
State. During a break after Montgomery's testimony, they objected to autopsy photographs that
the State proposed to introduce through testimony of the medical examiners on the basis that the
unfair prejudice that they created would substantially outweigh their probative value. The court
overruled the objection, but gave a running objection to each photograph.
      Before the State was allowed to call Dr. Guez, the attorneys made a lengthy objection out of
the presence of the jury on the grounds that Ludwig's conversations with her were privileged and
confidential and, even if admissible on other grounds, should be excluded under Rule 403 because
her statements would be more prejudicial than probative. The court granted a running objection
to her testimony.
      During Dr. Guez's testimony, several objections were made to the court's refusal to allow an
exhibit and questions about it—an exhibit that the court allowed for purposes of a bill of exception.
      At the conclusion of the State's case in chief, counsel made a motion for a directed verdict,
pointing out that the only evidence that linked Ludwig to the crime was O'Neil's testimony that
shells found at the scene were fired in the same shotgun as those found in the clinic in Katy and
that it "is ludicrous to state that Mr. Ludwig had possession of those shells." They also asserted
in the motion that the State had failed to prove that Ludwig had "intentionally and knowingly
murdered more than one person during the same criminal transaction" and that the only evidence
of intent to kill Matthew was O'Neil's opinion, which was based only on talks with the medical
examiner.
      Prior to beginning their rebuttal, counsel objected to the State's request that O'Neil be
"exempt from the rule" and permitted to return to the courtroom to hear the defense's expert
testimony.
      During rebuttal, counsel initially offered and the court admitted an affidavit from the Weather
Research Center of Houston showing that, at Ennis Texas, on June 14, 1990, the "moon rose at
0028 CDT and set 1201 CDT" and the "winds were southeasterly 5 to 10 mph with partly cloudy
skies at 6 pm with clouds increasing through the night to overcast by 6 am on the 15th June." They
also offered a portion of Ludwig's high-school yearbook, which the court admitted, to show "that
he was involved in his high school." 
      They presented a single witness, Dr. Robert Jordan, whose testimony has been described
earlier in this opinion. At the conclusion of all of the evidence, they renewed the motion for an
instructed verdict. As noted above, counsel objected to the charge on the basis that it did not
include the lesser-included offenses of murder and voluntary manslaughter.
      During final argument, counsel suggested that the entire case was based on conjecture and
suspicion. He suggested that Theresa lied when she "could not even give [Ludwig] the credit that
he deserves" and that she "did it for vengeance" and because she wanted to gain an advantage in
the divorce case. He also suggested that Dr. Guez lied and called her "a quack." He attributed
the State's entire case to a statement by Theresa's divorce attorney, who "told them that this man
had an acrimonious relationship, divorce dispute with his wife." He questioned the effectiveness
of the investigating officers and their failure to gather certain items of evidence that he suggested
would be helpful to the jury. He acknowledged that the shotgun shells were "the link up to the
case. That's the one bit of hard evidence to prove that Ronald Ludwig shot Matthew and Joe
Trojacek. The shells. But they're covering it up because something is wrong. Something is
missing or not telling the true story." Counsel argued that the jury should accept Dr. Jordan's
version of events and his opinion that the mark on Ludwig was not a "shotgun hickey,"
questioning the qualifications of the law enforcement officers to make that determination. He
asked the jury not to judge the case on suspicion, but "with cold hard facts." 
      As we have stated, many of the instances of conduct that Ludwig alleges as demonstrating that
his counsel were ineffective cannot be determined from this record. We find no evidence relating
to his allegations that his attorneys failed to seek out witnesses, failed to have him examined by
a doctor after his arrest, failed to investigate a report of another pickup in the vicinity of the
Trojacek residence, failed to have the shotgun shells tested by an independent expert, failed to
have a palm print analyzed, and failed to inform him about a plea bargain. Without evidence in
the record, Ludwig cannot sustain his burden of showing ineffective assistance; thus, arguments
on those assertions will not be considered. See McFarland v. State, 845 S.W.2d 824, 843 (Tex.
Crim. App. 1992). 
      Ludwig also asserts that counsel "asked a question of an expert that inferred his guilt" and
failed to object to Joe's "non-verbal conduct" as hearsay, to other hearsay, and to certain
statements that the prosecutor made. His right to effective counsel is not the right to error-free
counsel. See Hernandez v. State, 726 S.W.2d 53, 58 (Tex. Crim. App. 1986). Isolated failures
to object to improper evidence do not constitute ineffective assistance of counsel. Ingham v. State,
679 S.W.2d 503, 509 (Tex. Crim. App. 1984).
      Recognizing the strong presumption that counsel rendered adequate assistance and made all
significant decisions in the exercise of reasonable professional judgment, we cannot say that
Ludwig's complaints about his counsel are firmly founded. See Stafford, 813 S.W.2d at 506;
Jimenez, 804 S.W.2d at 338. Based on a review of the entire record, we find that Ludwig has not
demonstrated that his trial counsel were ineffective. See Archie v. State, 615 S.W.2d 762, 765
(Tex. Crim. App. [Panel Op.] 1981); Jimenez, 804 S.W.2d at 338. In making this assessment,
we consider the totality of the representation, rather than isolated acts or omissions of trial
counsel, and apply the test as of the time of the trial, not through hindsight. See Jimenez, 804
S.W.2d at 338.
      Having had the benefit of his attorneys' brief and heard their arguments on appeal, we reject
his claim that counsel filed an inadequate brief. In fact, he adopted five of their six points of
error, making only additional comments about the facts presented under those points. We overrule
point ten.
AFFIRMANCE
      Having overruled all of the points of error, we affirm the judgment.
 
                                                                                 BILL VANCE
                                                                                 Justice

Before Chief Justice Thomas,
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed February 16, 1994
Publish in part (see page 10)